CASE 0:18-cv-03263 WMV-BRT  Woodward v. Vogelsberg et al

**EXHIBITS #A001 THRU A012**

**AFFIDAVIT OF FORMER RAMSEY COUNTY SHERIFF DEPUTY DON SAZMA REGARDING HIS INVESTIGATION OF ALL THE DEFENDANTS**

## Affidavit

I, Donald Sazma, being first duly sworn upon oath, state and depose as follows:

I am a Licensed Private Investigator in the State of Minnesota. I do have a long history in law enforcement dating back to 1981 starting as a reserve police officer, then a part time Licensed Peace Officer for a Minnesota County Sheriff's Officer and then in 1995 I began working as a full time Licensed Peace Officer as a Deputy Sheriff for a Minnesota County Sheriff's Office. I retired at the end of October 2016.

While employed as a Deputy Sheriff, I worked in a variety of units and divisions throughout the department. During my career, I was assigned to specialized units where I worked cases with other Minnesota Law Enforcement Agencies and Federal Law Enforcement Agencies. I have an extensive amount of experience in conducting criminal investigations and utilizing informants for criminal investigations. I am well-versed in the criminal charging process and following an investigation through all the stages leading up to and through trial.

During the month of June 2018, I was retained by John Woodward to investigate his case in which he was convicted of Conspiracy to Commit murder against Dakota County Attorney James Backstrom. I obtained all the evidence along with trial transcripts that were in the possession of Mr. Woodward's Attorney's. The investigation I conducted was thorough which included reviewing the written law enforcement reports, listening to all the audio recordings, viewing all the video recordings along with going through the trial transcripts pertaining to the testimony of witnesses. In addition, extensive analytical investigative work was conducted.

Upon the completion of the investigation in which I conducted, based on my professional opinion as being a Minnesota Licensed Peace Officer, I can say with complete confidence that Employees of the Rice County Attorney's Office, the Dakota County Sheriff's Office, The Minnesota Bureau of Criminal Apprehension Agents were all performing the functions of their offices in good faith based on the information and facts that they received from specifically

#A001

Minnesota Department of Corrections Investigator Same Azure, Faribault Police Detective Mark Krenik and Faribault Police Office Robert Vogelsberg.

During the scope of the investigation in which I conducted, it was learned that the informant utilized by these investigators on numerous occasions provided information to investigators that was contradictive and the credibility of the informant should have been recognized by the investigators. At the time when the Conspiracy to Commit Murder against Mr. Backstrom, Mr. Woodward and Thomas Jackson were both incarcerated at the Minnesota Correctional Facility Faribault. Mr. Jackson had an extensive criminal history which included multiple crimes pertaining to financial crimes. One of his convictions was a "Theft by Swindle" which occurred at another Minnesota Correctional Facility in which the victim of the crime was another inmate. Krenik testified during trial that he (Krenik) did not know Mr. Jackson's criminal history when he (Krenik) was conducting the investigation and learned about it later.

Based on my professional experience upon reviewing all the facts associated with the case Mr. Jackson was in the process of committing another "Theft by Swindle" in which Mr. Woodward and his spouse would have been victims of the crime. Jackson had contacted the common attorney that was doing legal work for both Jackson and Woodward and Jackson told Ms. Tarvestad that Mr. Woodward was buying a truck from him (Jackson) and that Ms. Woodward would be sending Ms. Tarvestad $2500. Jackson never had a truck to sell. Krenik, Vogelsberg and Azure never questioned anyone or made any attempts to find out if Jackson was possibly in the process of committing a crime or covering up a crime that he committed.

Detective Krenik wrote very detailed reports in which facts that would benefit the case against Mr. Woodward were included, however facts that were exculpatory and favorable in assisting Mr. Woodward to prove he was innocent was excluded from Detective Krenik's detailed reports. Even though Krenik knew this information, which was discovered on an audio recorded interview of Mr. Jackson which occurred on July 19, 2010, Detective Krenik omitted these facts from a search warrant in which he drafted and executed on August 10, 2010. During this interview of Mr. Jackson on July 19, 2010, Detective Vogelsberg and Mr. Azure were also present. Reports written by Vogelsberg and Azure were vague.

One key piece of evidence used against Mr. Woodward, was a detailed map of the area where Mr. Backstrom lived. The details of this Map included markings in which the time of the murder was to occur, streets and other landmarks, bushes in which Mr. Jackson could hide behind and shoot Mr. Backstrom as he was going to work, arrows indicating the route in which Mr. Backstrom would leave, along with ponds in which the weapon could be disposed of. Jackson told investigators that this map was drawn on June 5, 2010. On June 30, 2010, Jackson met with Mr. Azure and provided him with the detailed map along with stating that he intentionally had Mr. Woodward draw the Map in an area of the prison so it would be captured by the prison cameras.

On July 19, 2010 when Jackson was being interviewed by Krenik, Vogelsberg and Azure, Jackson told the investigators that the Map was drawn by Woodward and it was very detailed. Later in the interview Jackson made the statement that the Map that was drawn by Woodward was a little bit vague and that Jackson took the pencil and gathered more information. After hearing this from Jackson, none of the investigators asked Jackson any questions pertaining to clarification as to what Jackson might have written on this detailed Map. On August 16, 2010, during a post Miranda interview with Mr. Woodward, Krenik was present and Mr. Woodward stated that the Map was the area in which he lived and that he did not write the time of 8-8:30 on the Map. BCA Agent Nance was the primary interviewer. Krenik never informed Agent Nance that Jackson had previously mentioned that the Map was a little bit vague and that Jackson took the pencil and gathered more information.

During the July 19, 2010 interview, Jackson went into details about how he called Ms. Tarvestad and said that Mr. Woodward was going to buy a truck from him and that Cindy Woodward would be sending her $2500. Jackson then went onto say that he (Jackson) had contacted Ms. Tarvestad and that she had received the money and that the money wasn't really for a truck deal and that he (Jackson) would be sending a letter to her (Tarvestad) explaining what it was really for because he couldn't discuss it over the phone. Jackson also said that he contacted Ms. Tarvestad and told her that if Mr. Woodward calls her that she isn't to talk to Woodward about the truck, that the truck deal doesn't exist and don't even fool with that. Jackson told Krenik, Vogelsberg and Azure about other phone calls that Jackson made to Ms.

#A003

Tarvestad. Azure had access to the recorded phone calls at the Minnesota Correctional Facility – Faribault. Azure only saved one recorded phone call (during the months of May and June 2010) between Ms. Tarvestad and Mr. Jackson. This call occurred on June 25, 2010. During this phone call, Tarvestad questions Jackson about the transfer of the vehicle – and Jackson responds by saying it's not going to happen until I get paid. Jackson goes onto say, you haven't received it yet anyways (referring to the $2500.) Krenik, Vogelsberg and Azure never preserved any of these other recorded phone conversations (for the months of May and June 2010) which may have been exculpatory evidence for Mr. Woodward to prove he was being truthful.

During trial when Jackson was being directly examined, Jackson mentioned that he wrote on this detailed Map. This was an obvious surprise to Counsel for the State. Counsel for the State continued to ask questions pertaining to other markings on the Map and Jackson responded one after another that he wrote these items on the Map. This included, bushes, markings where the weapon could be disposed of in the pond, ramps and other bushes, markings pertaining to distances such as a half mile, and a star depicting Mr. Backstrom's house being directly next door to Mr. Woodward's. During the post Miranda interview of Mr. Woodward on August 16, 2010, Mr. Woodward stated that he never told Jackson as to where Mr. Backstrom lived and that everyone knew that Mr. Backstrom was his neighbor.

On August 16, 2010, Krenik heard Mr. Woodward state this and obviously never went back and looked at the detailed Map closer and investigate as to where Mr. Backstrom's house was in relation to Mr. Woodward's. Had Krenik done this he would have discovered that there was another house and property directly between the house of Mr. Woodward's and Mr. Backstrom's. During trial, under cross examination, Dakota County Sgt. Rogers and BCA Agent Nance were asked if they were aware that Jackson wrote 8-8:30 and the arrows on the detailed Map. They both responded that they were not aware of this. Under direct testimony, Sgt. Rogers provided testimony as to the route that Mr. Backstrom would take to work which correlated to the arrows drawn on the map. After providing this statement and while being crossed examined, Sgt. Rogers stated that he was not aware that Jackson drew the arrows on the Map.

#A004

On July 19, 2010, when Jackson was being interviewed by Detective Krenik, Detective Vogelsberg and DOC Investigator Azure, Jackson told the investigators that Mr. Woodward wanted Mr. Jackson to murder Mr. Backstrom on December 14, 2010, the day that Mr. Jackson would be released from prison and that Mr. Backstrom left for work at about 8:30 am every morning like clockwork. Later in the interview, Jackson told investigators that Mr. Woodward told him (Jackson) that on the day that he (Jackson) got released from prison on December 14, 2010 to book his (Jackson's) flight at 5 pm and then at 9:00 am, when he (Jackson) got released from prison he could kill Mr. Backstrom quickly when he (Backstrom) was on his way to work and then he (Jackson) could get on his flight and travel to Maryland. Krenik, Vogelsberg and Azure all heard this and none of them mentioned it in their reports. It was obvious that it would be impossible for Jackson to Murder Mr. Backstrom at 8:30 am because Jackson would have still been in prison until 9 am on December 14, 2010. In addition, there was other exculpatory statements in this interview that were omitted in reports and never investigated properly.

I discovered a recorded conversation between Mr. Azure and Jackson, which occurred on July 22, 2010. During this recorded conversation Jackson inquired about the recording device that was going to be used for the "Controlled Recordings" which would occur on July 30, 2010 and August 9, 2010. These "Controlled Recordings" would consist of Mr. Jackson having the recorder in his pocket and capture the conversation that he (Jackson) was having with Mr. Woodward pertaining to the murder plots. During this recorded interview, Azure does tell Jackson that the device does have an "on-off" switch. Also, during this conversation, Jackson tells Azure about additional murder plots that Jackson claimed that Mr. Woodward wanted to be done with the potential victims being an informant and County Judge. Detective Krenik never mentioned anything in his report about obtaining this information on July 22, 2010. Krenik does mention it when the "Controlled Recordings" were conducted. The "order for detention" states that these three plots were all planned starting on or about June 5, 2010.

Furthermore, on July 22, 2010 Jackson told Azure that Woodward told Jackson that he (Woodward) wanted Jackson to kill the female informant by sticking her with a needle of heroine. During the Controlled Recordings, Jackson asks Woodward about how he (Woodward) wanted to deal with the female informant and Woodward responded by saying just beaten up.

5

#005

What Jackson said on July 22, 2010 to Mr. Azure contradicted what was heard on the Controlled Recordings.

On July 30, 2010 and August 9, 2010, controlled recordings were conducted between Jackson and Woodward. For both of these dates, the audio recording device was separate from the video recording device. The video recording was obtained by using the surveillance cameras at the Faribault Prison – which doesn't have audio capabilities. Therefore, a self-contained audio recording device was utilized. On both dates, the date and starting times were never dictated on the audio recorder device and the ending time was never dictated on these recordings. Upon reviewing the audio recordings, it was obvious that Mr. Jackson was extremely pushy pertaining to these plots and Jackson was constantly pushing leading questions onto Mr. Woodward and it was obvious that Mr. Woodward did not want anything to do with murdering anyone.

On the August 9, 2010 controlled recording, Mr. Woodward states specifically the words to Mr. Jackson that the "The money I (Mr. Woodward) had Cindy (Woodward's spouse) send to Jan (Jan Tarvestad) for any additional legal work if we needed it" specifically stated that the money was for legal work and not for a down payment for the murder of Mr. Backstrom. Detective Krenik wrote a very detailed report pertaining to the controlled recording, however he omitted this exculpatory statement in his report. Krenik also omitted this statement in the search warrant that he drafted on August 10, 2010 for the residence of Jan Tarvestad.

Of all the recorded conversation I listened to, Mr. Woodward does not state one single time that he wanted anyone murdered. Mr. Woodward was only interested in getting out of prison hoping that some legal work would be ruled in his favor. Jackson had access to and was helping Woodward with these legal filings. The legal filings pertained to Mr. Woodward's drug conviction in which Jackson had access to the names of Backstrom, the female informant and the County Judge.

On August 3, 2010, Krenik obtained from Mr. Azure and listened to two recorded phone conversations between Mr. Woodward and his spouse Cindy Woodward which occurred on June

6

#A006

21, 2010 and June 23, 2010. Krenik also obtained and viewed three video clips from Mr. Azure pertaining to June 5, 2010 when the Map was drawn. The video clips pertaining to the Map being drawn are at a distance and Azure identifies Woodward and Jackson in the video for Krenik. Krenik reviewed both recorded phone calls and states that Woodward requested his spouse Cindy to send a check to Jan Tarvestad for $2500 on June 21, 2010. On June 23, 2010 Krenik states that during the recorded conversation that Cindy Woodward tells Mr. Woodward that the money has been sent. For the date of August 3, 2010, Krenik omitted this information in his Faribault Police Department Police report. He did however reference the date of August 3, 2010 along with the recorded phone conversations and video clips when he drafted his affidavit for a search warrant on August 10, 2010 for the property of Ms. Tarvestad.

During my investigation, I reviewed the three video clips pertaining to June 5, 2010 and the two recorded phone conversations between Mr. Woodward and his spouse Cindy Woodward. The video clips do show two males sitting at a table and this is at a distance. There is no close up video showing what Woodward and Jackson are specifically doing at the table – and there is no close up video of the map physically being drawn. Woodward and Jackson both stated that a Map was being drawn. However, whether Mr. Jackson drew specific items on the Map at this time is unknown. The cameras are at a distance and whether Jackson actually sealed the envelope at the table as he claimed cannot be determined. Also, there were no witnesses who specifically stated that Jackson physically sealed the envelope at this time. Jackson can be seen going back to his cell, however he could have easily drawn all the items related to the murder plot on the Map anytime between June 5, 2010 and June 30, 2010 just before he gave the Map to Azure.

On August 16, 2010, during a post Miranda interview of Mr. Woodward which was conducted by BCA Agent Nance and Detective Krenik, Woodward cooperated with the investigators. During this interview, Mr. Woodward made the following statements: Woodward: I was just trying to shut him (Jackson) up, he kept hounding on me, if you listen to these tapes, have you ever listened to them, verbally listened to them, cause he just pounds on me. He's all over me. And then did you notice on the tape, when I say to him <u>Jackson listen, you've been hounding me about this and the truth of the matter is, I don't want you to kill</u>

7

#A007

<u>anybody, I don't want you to do anything illegal, just forget it, forget it. I wouldn't have you kill anybody for me</u>.

Woodward: Did you ever listen to this stuff (referring to Krenik and Nance) I mean come on.

During this interview, Woodward stated that the funds were solely for the purpose of having Ms. Tarvestad to perform legal work. Jackson and Woodward were using the same attorney. Woodward also told investigators that these funds were never for the purpose of purchasing a truck from Jackson and that the guise of a truck was solely Jackson's doings and never had anything to do with a down payment of a murder for hire.

During the investigation in which I conducted, I went through the controlled recordings that occurred on July 30, 2010 and August 9, 2010. On the July 30, 2010, there is one particular area in which the background noise suddenly changes and the conversation didn't flow as a person would expect. This is a strong indication that Jackson most likely turned off the recorder for a short period of time then turned it back on. On the August 9, 2010 Controlled Recording even though the audio recording does not have a starting and ending time, I was able to determine by using the date/time stamp on video and finding the exact part of the audio recording that aligned with the video in which the video does zoom in on Jackson and Woodward and the lips are clearly synchronized with the audio. On the audio recording, Woodward and Jackson are together and Woodward does say "It's 7" referring to 7 pm. Forty-five seconds later, when Jackson gets into his cell, Jackson speaks the words "It's 7:01, I'm in my room." By using the synchronized alignment time, during that period of ten minutes between 6:51 pm and 7:01 pm, the total running time of the audio recording during this ten-minute period is 4 minutes and 58 seconds. There is in fact five minutes and 2 seconds missing from the "controlled recording." This is clear and convincing evidence that Jackson did in fact turn the recording device off for this period of time and then turned it back on. It should be noted, that during the entire controlled recording which lasted over an hour, Jackson and Woodward can only be seen on the video for a period of about three minutes. All the other times, they are out of view of the camera. When Jackson turned the recording device off and then back on, this was unknown to everyone else and nobody knew that Jackson did this.

#A008

Shortly after both controlled recordings were made, Krenik did review the audio recordings. During this review, Krenik should have noticed that there wasn't a starting time and ending time on both of these audio recordings. Krenik was told by Woodward on August 16, 2010 that Woodward specifically told Jackson that he didn't want anyone killed. Woodward also asked both investigators if they had physically listened to the tape. (It should be noted, that Agent Nance had never listened to the audio recordings and Agent Nance relied on information in which Krenik briefed him.) Krenik was told this information by Woodward and failed to properly investigate to see if Mr. Woodward was telling the truth or not. Furthermore, Krenik had conflicting information and should have at the minimum reviewed the audio recordings to check the integrity of both audio recordings to make sure that the recordings were complete and accurate and that nothing was missing from the recordings. If Krenik had properly reviewed the audio recordings, he should have noticed that there wasn't a starting and ending time on both recordings and there might be in fact parts missing from the recordings.

On August 10, 2010, Detective Krenik drafted an application for a search warrant to be conducted at the residence of Ms. Tarvestad. Detective Krenik used the term CI rather than using Jackson's name. Detective Krenik presented this application to a Stearns County Judge who signed it based on the information provided by Detective Krenik. This search warrant was pertaining to seizing bank records, letters and other items pertaining to the case against Mr. Woodward. In the application for the search warrant, Detective Krenik makes reference to the Detailed Map drawn by Mr. Woodward on June 5, 2010. (On July 19, 2010, Krenik was told by Jackson that the Map that Woodward drew was a little bit vague and that Jackson took the pencil from Woodward.) Krenik makes reference that there was a specific date and time in which Jackson would murder Backstrom for Mr. Woodward. (On July 19, 2010, Krenik was told by Jackson that this was to occur on December 14, 2010 when Mr. Backstrom left for work at 8:30 am. Jackson also told Krenik that Woodward told Jackson that at 9 am when Jackson got released from prison on December 14, 2010 that he (Jackson) could do it really quick and then be on a plane to Maryland. Krenik knew that it would be impossible for Jackson to Murder Mr. Backstrom considering that Woodward wanted this done at 8:30 in the morning when Mr. Backstrom was leaving for work and Jackson wouldn't be released from prison until 9 am.)

In the application for the search warrant, Krenik had nothing to corroborate that the CI (Jackson) physically sealed the envelope on June 5, 2010. The prison cameras don't provide any close up view of this being done. At this time, Krenik had nothing other than the word and words spoken by the CI (Jackson) that the $2500 was solely for the purpose of a down payment for the murder of Mr. Backstrom. Krenik mentioned that the CI said that Woodward told the CI that he (CI – Jackson) could dump the weapons in the pond. (During the controlled recordings, the CI (Jackson) is the one that said he (CI – Jackson) could dump the weapons in the pond.) Krenik listened to the controlled recordings and had to have known this.) Krenik had nothing to validate or support the credibility of the CI (Jackson) when Krenik presented the search warrant to the Stearns County Judge. There wasn't a Confidential Informant Packet done by Krenik, Vogelsberg or Azure to show any credible information that the CI (Jackson) had provided to Law Enforcement in the past to make Jackson what would be considered a CRI – Confidential Reliable Informant.

After the search warrants were executed at Ms. Tarvestad's residence, letters that Jackson had sent Ms. Tarvestad were recovered. One a letter that Jackson mailed to Ms. Tarvestad on June 23, 2010 in which Jackson states that the truck deal was only a guise and the actual purpose of the $2500 was for the down payment of murdering James Backstrom, Jackson includes on the bottom of the letter that if Cindy (Mr. Woodward's wife) sends her (Tarvestad) the money, to do as she (Tarvestad) was previously instructed to do by Jackson. Krenik had this information and failed to perform any analytical work pertaining to the investigation. Simple analytical work would have shown that Jackson lied when he (Jackson) stated that the funds were already sent to Ms. Tarvestad.

During trial over two years later, BCA Agent Nance testified pertaining to the interview of Mr. Woodward on August 16, 2010. Detective Krenik was present during this interview. Agent Nance testified that Mr. Woodward was not credible with anything he (Woodward) said. When Agent Nance was cross examined, Agent Nance responded that he had never heard any of the audio recordings and that the information he had about the case was by Krenik providing a brief summary to him. While being crossed examined, Nance stated that he was not aware of Jackson's criminal history, he was not aware that Jackson had been previously convicted of

swindling other inmates at another correctional facility. Nance was never told that Jackson had access to Mr. Woodward's legal documents that contained the names of Mr. Backstrom, the County Judge and the informant. Agent Nance was not aware that Jackson wrote 8-8:30 on the detailed map. Nance was not aware that Jackson had wrote the arrows on the detailed map. Agent Nance was not aware of the other notations that Jackson wrote on the Map. Agent Nance said that it would have been helpful to have known all this information to help determine whether Mr. Woodward was telling the truth. Krenik was the lead investigator and he never bothered to inform investigators from other agencies who were assisting with the investigation.

In conclusion, based on my professional experience as a Minnesota Licensed Peace Officer. There were two separate things going on. Jackson was attempting to commit "Attempted Theft by Swindle" in which Mr. Woodward and his spouse Cindy would have been victims, however, when Jackson was questioned by his attorney Jan Tarvestad about the funds and the vehicle, Jackson then attempted to cover up his attempted crime by going to DOC Investigator Azure with his (Jackson's) story along with the Map. The Map drawn on June 5, 2010 was most likely for the purposes of blackmailing Mr. Woodward so when the swindle of $2500 was completed by Jackson, Jackson would threaten Woodward with the map.

Detective Krenik, Detective Vogelsberg and Investigator Azure conducted their investigations in a manner that is unprofessional. Information that they received that would have been exculpatory evidence and helped prove Mr. Woodward's innocence was omitted from their reports. Information that would be favorable to convict Mr. Woodward was written into their reports. Information that they received which would normally be followed up with additional investigative work, wasn't conducted or followed up on such as asking Jackson "what did he write on the map." Obvious information such as the timeline of the murder being impossible was never passed onto supervisors, other investigators or the Rice County Attorney. This was known and Krenik, Vogelsberg and Azure never mentioned it in their reports.

Krenik was told by Woodward specific words in which he (Woodward) spoke during the controlled recordings along with Woodward stating specifically that he did not write 8-8:30 on the detailed map. Krenik was with Agent Nance during this interview and Krenik chose to

11

#A011

remain silent and not inform Agent Nance. In addition, after hearing this from Mr. Woodward, Krenik obviously chose to ignore everything that Mr. Woodward said and it's obvious that Krenik never went back to check the controlled recordings to see if parts of the recording were missing by checking for the starting and ending times on the audio recordings. This could have easily been discovered back in 2010, long before the trial. Krenik, Vogelsberg and Azure were aware that both Jackson and Woodward were inmates at the prison and that all the phone calls by inmates were recorded. Considering conspiracy to commit murder is a major criminal investigation and should have been treated the same why a homicide is investigated, recorded phone calls made by both Jackson and Woodward should have been preserved starting before the dates of when the conspiracy plans started. Azure was an investigator for the DOC and had access to all of these recordings.

Krenik was the lead investigator and he never mentioned anything to Azure about preserving those phone calls. Those recordings themselves could have either provided credibility pertaining to what Jackson was saying, could have provided information proving that Woodward wasn't being truthful creating a solid case against Woodward, or these recordings could have provided Woodward with exculpatory evidence proving that he was innocent and Jackson was untruthful and that Jackson had no credibility. Furthermore, those recordings could have provided evidence in which Jackson was committing the crime of Attempted Theft by Swindle.

STATE OF MINNESOTA   )
                    )ss
COUNTY OF DAKOTA    )

I, _____, being first duly sworn and under penalty of perjury, declare the above statement is true and correct to the best of my knowledge:

_____          _____
(Signature)                                  (Date)

Signed and sworn before me this _____ day of _____, 2018

_____
Notary Public

JOSHUA DAVID ORTH
Notary Public-Minnesota
My Commission Expires Jan 31, 2024

12

#A012